In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-19-00065-CV
_____

IN THE INTEREST OF S.J.B. AND A.B.

On Appeal from the 88th District Court
Hardin County, Texas
Trial Cause No. 58415

MEMORANDUM OPINION

Appellants J.B. and M.L.[1], the father and mother of the minor children S.J.B.

and A.B., appeal the trial court's order terminating their parental rights after a bench

trial. In four issues, appellants challenge the legal and factual sufficiency of the

evidence supporting the findings that they (1) allowed the children to remain in

conditions or surroundings that endangered their physical or emotional wellbeing;

---

[1]The children's mother, M.L., filed a letter brief stating that she adopts the issues raised in J.B.'s brief. Therefore, we will also address J.B.'s issues as to M.L., and we refer to J.B. and M.L. collectively as "appellants[.]"

1

(2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional wellbeing; (3) failed to comply with the provisions of a court order; and (4) that termination was in the best interest of the children. We affirm the trial court's order terminating appellants' parental rights.

## BACKGROUND

J.B. testified that the children were removed from his care due to him failing a drug test for methamphetamine and "[b]ad living conditions[,]" and he explained that he "wasn't taking care of things." J.B. admitted that he had a problem with methamphetamine and alcohol and had been to rehabilitation. In addition, J.B. admitted that he had consumed alcohol since leaving rehabilitation. J.B. described alcohol as his "preferred drug of choice." J.B. explained that although his service plan required him to attend AA or NA meetings, he had not done so.

According to J.B., when the children were removed, he had been living with M.L., her boyfriend, and the children. When the children were removed, J.B. received a service plan, and he testified that "quite a few" months went by before he began to work on the service plan. At the time of trial, J.B. resided with his mother, and he usually relied upon his mother for transportation. When asked where the children would go if the judge decided to return them to his care, J.B. testified, "I

2

don't really have anywhere for them to go." According to J.B., the children could not live with M.L. because M.L. was residing in her sister's home, and her sister did not "want a bunch of people living there." J.B. also explained that he is not currently employed and does not have the financial resources to care for the children.

Gary Spears, an investigator for the County Attorney's Office, testified that on July 13, 2017, he was sent to the home of M.L. and J.B. regarding a reported assault and "a report about some possible bomb-making materials." Spears wore a body camera when he went to the home, and the video recording from the camera was admitted into evidence and published to the court. The video showed that the home was dirty, cluttered, and in disrepair. Spears explained that he did not find any bombs or bomb-making materials in the home, but he described the home's condition as "pretty bad[]" and stated that he had concerns about the safety of the home. According to Spears, the home was unsafe for the children because it was cluttered, "nasty[,]" and infested by ants.

Katheryn Parrott, a supervisor for the Department of Family and Protective Services ("the Department"), testified that she received a report of neglectful supervision of the children on July 14, 2017. Parrott testified that prior to visiting the home of J.B. and M.L., she viewed a video of the home that caused her concern because M.L. appeared to be under the influence and things were "scattered all

3

throughout the home[.]" When Parrott entered the home, she saw a butcher knife on a shelf that was accessible to the children, bottles of alcohol, animal feces, an infestation of ants, noticed an odor, and there was very little food in the home. According to Parrot, M.L. told her that she did not drink alcohol. Parrot explained that when she visited the home on one occasion, one of the children was "eating dried oatmeal out of a package."

When asked why she was concerned for the children's safety in the home, Parrott testified, "The butcher knife. The fact that [M.L.] had said that [J.B.] is an alcoholic and I observed alcohol bottles just scattered on the floor in the home led me to believe that someone is consuming a significant amount of alcohol in the home." Parrott also explained that the beds she observed were soiled. In addition, Parrot testified that J.B. told her he used Adderall without a valid prescription and had smoked marijuana. According to Parrott, M.L. had reported that she believed one of the older children smoked marijuana.[2] According to Parrott, M.L. told her that she feared CPS because CPS receives $2000 for each removed child, and "[w]e look for kids that have blue eyes and then we put them in a warehouse." Parrot testified that M.L.'s mental health was a concern. Parrott also testified that she was concerned because M.L. said that she was no longer taking her prescribed

---

[2]The older children are not involved in this appeal.

4

medications. In addition, Parrott explained that the Department received another intake regarding a physical altercation between M.L., her boyfriend, and one of M.L.'s older children, which occurred at the home. Parrott testified that M.L. failed to submit to required drug testing. When Parrott returned to the home on one occasion, she determined that it had not been sufficiently cleaned, and she decided to proceed with removal. Parrot explained that she considered the home to be in horrible condition and she would not want children there.

Licensed psychologist Dr. Nisha Amin testified that she completed a psychological evaluation of M.L., which involved "a mental status evaluation as well as testing in the areas of intellectual functioning, achievement, and emotional and personality functioning." Amin concluded that M.L. has difficulties with reasoning and logic, has experienced auditory and visual hallucinations, and has difficulty organizing her thoughts. She diagnosed M.L. with schizoaffective disorder, bipolar type. In addition, Amin diagnosed M.L. with major depressive disorder, PTSD, generalized anxiety disorder, ADHD, substance abuse disorder, and borderline personality disorder. Amin explained that people with M.L.'s diagnoses would have difficulty gauging children's needs and how to gauge the appropriate parenting abilities that are needed for various situations.

Amin characterized M.L. as having a "severe mental health history[]" and stated that M.L. "has a difficult time in recognizing responsibility for the situation that she was in, or her children for that matter." According to Amin, M.L. is involved in a dysfunctional relationship, lacked social support, and only stayed in the relationship because it is her only means of financial support. Amin opined that M.L. tends to cling to relationships at any cost, even if doing so is hurtful to herself or her children. She indicated that M.L. is financially unable to independently provide shelter and support for her children, lacks emotional stability, has mental health issues that prevent her from making appropriate decisions for the children, and lacks social and community resources. According to Amin, the children are "pretty much running their lives on their own with very minimal supervision[,]" and M.L. did not understand how intrusive drug abuse is for the children.

Amin expressed concern regarding M.L.'s failure to take her prescribed medications and noted that historically, M.L. tried prescribed medications but would eventually self-medicate with drugs. Furthermore, Amin testified that M.L.'s understanding of disciplining children is limited, and M.L. does not understand the difference between punishment and positive reinforcement. Amin opined that M.L.'s mental deficiencies and diagnoses prevent her from caring for the children, and she predicted that M.L. would not be able to sustain long term sobriety or mental health

6

treatment. According to Amin, given M.L.'s lack of cognition, limited achievement, poor social support, and emotional dysfunction, she would be unable "to parent effectively long term." Amin further opined that returning the children to M.L. would harm the children and put them in an unsafe environment.

Licensed professional counselor Yolanda Pearl Jessie testified that the Department sent M.L. to her office for counseling. According to Jessie, during the initial assessment, M.L. behaved erratically, had trouble staying focused, and suffered from "a notable anger problem." Jessie explained that after M.L.'s first appointment, M.L. appeared as an unscheduled patient on one occasion and "created a scene[.]" According to Jessie, three separate sessions were needed to complete the psychosocial assessment, but M.L. only attended two appointments.

Licensed chemical dependency counselor Michael Cary testified that he counseled J.B. for twelve face-to-face sessions and approximately five phone sessions. Cary explained that J.B. had a problematic history with methamphetamine and alcohol. According to Cary, J.B. did not disclose his alcohol abuse at the beginning. Cary explained that during counseling, J.B. tested positive for alcohol and had a dilute negative result on a drug screening. Cary testified that J.B. sometimes struggled to attend face-to-face sessions because J.B. relied upon his mother for transportation.

Cassie Boyd, a case worker with the Department, testified that both M.L. and J.B. were involved in an altercation during one of their visits to the Department, which resulted in the police being called. During the altercation, M.L. used profanity and refused to take a drug test, and J.B. completed a drug test but admitted that he had used methamphetamine a few days before. According to Boyd, J.B.'s psychosocial assessment took longer than expected because he was dishonest with the counselor. Boyd explained that the children were not attending school while in the care of M.L.

Boyd testified that on one occasion when she visited the home of M.L. and J.B., the house was in disarray, there were packages of meat on the floors, two large cases of beer in the kitchen, the floor was covered with items, and "[y]ou had to be really careful where you were walking." According to Boyd, the home was unsanitary, hazardous, and unsafe for younger children like S.J.B. and A.B. Photographs of the home's condition were admitted into evidence. Boyd explained that when the children were removed, the home was "filthy[,]" infested with rats and ants, lacked food, and there was trash throughout the home. Boyd testified that when the children came into the Department's care, they had lice. According to Boyd, M.L. was not taking her prescribed medications.

Boyd explained that S.J.B. and A.B. are doing well in their foster home, their needs are being met, and they are attending school, and Boyd testified that the Department believes the placement is in the children's best interest. According to Boyd, the children's foster parents wish to adopt them, and she testified that their foster parents were providing them with a loving and caring home, and the children are safe and happy. Boyd testified that the foster parents are meeting the children's physical, emotional, and medical needs. Boyd opined that termination of the parental rights of M.L. and J.B. is in the children's best interest.

Dorothy Stanley, the guardian ad litem for the children, testified that S.J.B. has "blossomed[]" and has bonded with her foster mother. Stanley testified that she recommended terminating the parental rights of J.B. and M.L. to allow the children to be adopted by their foster parents, and she opined that adoption by the foster parents is in the children's best interest. According to Stanley, J.B. had indicated that he could not take the children and J.B.'s mother will not allow the children in her home. In addition, Stanley testified that the children needed permanency to meet their emotional and mental needs, and she expressed concern about the results of J.B.'s drug and alcohol tests and recommended termination of J.B.'s parental rights. Stanley testified that after counseling, the children "are content where they are." Stanley testified that M.L.'s mental health issues are a concern, and M.L. currently

will not allow access to her home, and Stanley opined that termination of M.L.'s rights is in the children's best interest.

S.J.B. testified that she would like for her foster parents to adopt her, although she also loves M.L. and J.B. When asked whether she "would be okay with never seeing [M.L. and J.B.] again[,]" S.J.B. answered affirmatively. S.J.B. later testified that she would like to "just visit[]" M.L. and J.B. S.J.B. also later testified that she would prefer to live with J.B. and her brothers at her grandmother's house. A.B. testified that she loves M.L. and J.B. and she would prefer to live with them. After the trial concluded, the trial judge signed an order terminating appellants' parental rights.

## ANALYSIS

In four appellate issues, appellants challenge the legal and factual sufficiency of the evidence supporting the findings that they (1) allowed the children to remain in conditions or surroundings that endangered their physical or emotional wellbeing; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional wellbeing; (3) failed to comply with the provisions of a court order; and (4) that termination was in the best interest of the children. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (2) (West Supp. 2018).

Under legal sufficiency review, we review all the evidence in the light most favorable to the finding to determine whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In the Interest of J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id*. If no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, the evidence is legally insufficient. *Id*.

Under factual sufficiency review, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *Id*. We give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id*. We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor if its ruling. *Id*. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id*.

The decision to terminate parental rights must be supported by clear and convincing evidence, *i.e.*, "the measure or degree of proof that will produce in the

11

mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2019); *In the Interest of J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001 (West Supp. 2018); *see also In the Interest of J.L.*, 163 S.W.3d at 84. We will affirm a judgment if any one of the grounds is supported by legally and factually sufficient evidence and the best interest finding is also supported by legally and factually sufficient evidence. *In the Interest of C.A.C., Jr.*, No. 09-10-00477-CV, 2011 WL 1744139, at *1 (Tex. App.—Beaumont May 5, 2011, no pet.) (mem. op.). However, when, as here, a parent challenges a trial court's findings under section 161.001(1)(D) or (E), we must review the sufficiency of those grounds as a matter of due process and due course of law. *In the Interest of N.G.*, ___ S.W.3d ___, 2019 WL 2147263, at *4, *6 (Tex. May 17, 2019) (not yet published).

Section 161.001(1)(D) of the Family Code allows for termination of a parent's rights if the trier of fact finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(1)(D). Section 161.001(1)(E) allows for termination

12

if the trier of fact finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(1)(E). A parent's conduct in the home, such as illegal drug use, can create an environment that endangers the child's physical and emotional well-being. *In the Interest of J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). "One parent's drug-related endangerment of the child may be imputed to the other parent." *Edwards v. Tex. Dep't of Protective & Regulatory Servs.*, 946 S.W.2d 130, 138 (Tex. App.—El Paso 1997), *overruled on other grounds, In the Interest of J.F.C.*, 96 S.W.3d at 266. "The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent." *In the Interest of M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.).

Regarding the children's best interest, we consider a non-exhaustive list of factors: (1) the desires of the child; (2) emotional and physical needs of the child now and in the future; (3) emotional and physical danger to the child now and in the future; (4) parental abilities of the individuals seeking custody; (5) programs available to assist these individuals to promote the best interest of the child; (6) plans for the child by these individuals or by the agency seeking custody; (7) stability of

13

the home or proposed placement; (8) acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see* Tex. Fam. Code Ann. § 263.307(b) (West 2019). No particular *Holley* factor is controlling, and evidence of one factor may be sufficient to support a finding that termination is in the children's best interest. *See In the Interest of A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.). The best interest determination may rely on direct or circumstantial evidence, subjective facts, and the totality of the evidence. *See In the Interest of N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.).

The trial judge heard evidence that J.B., M.L., M.L.'s boyfriend, and the children had all lived together. The trial court also heard evidence that J.B. used methamphetamine and had a problem with alcohol. In addition, the trial judge heard testimony and saw photographs and video showing that the home was cluttered, dirty, infested with rats and ants, in disrepair, and dangerous for the children. The trial court heard testimony that M.L. suffered from schizoaffective disorder, bipolar type, major depressive disorder, PTSD, generalized anxiety disorder, ADHD, substance abuse disorder, and borderline personality disorder, and she was not taking her prescribed medications. The trial judge further heard testimony that M.L.'s

14

mental health issues prevent her from making appropriate decisions for the children and supervising them properly. Furthermore, the trial court heard testimony that a physical altercation occurred between M.L., her boyfriend, and one of the older children at the home, and the children had lice at removal. Viewing the evidence in the light most favorable to the trial judge's findings, we conclude that the trial judge could reasonably have formed a firm belief or conviction that M.L. and J.B. (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *In the Interest of J.F.C.*, 96 S.W.3d at 266; *In the Interest of J.T.G.*, 121 S.W.3d at 125; *Edwards*, 946 S.W.2d at 138.

With respect to the children's best interest, the trial court heard evidence from Boyd that the children are doing well in their foster home, and their emotional, medical, and educational needs are being met. The trial court heard the guardian ad litem opine that termination of appellants' parental rights and allowing the children to be adopted by their foster parents is in the children's best interest. In addition, the trial court heard evidence that J.B. is unemployed and lacks the financial resources to care for the children, and that M.L.'s mental health issues prevent her from making

15

appropriate decisions for the children and supervising them properly. The trial judge further heard evidence that M.L.'s mental health issues make her unlikely to be able to sustain long-term sobriety or to comply with mental health treatment. Amin testified that returning the children to M.L. would harm them and place them in an unsafe environment. Prompt and permanent placement of the children in a safe environment is presumed to be in their best interest. *See* Tex. Fam. Code Ann. § 263.307(a) (West 2019). As the sole judge of the credibility of the witnesses and the weight to be given to their testimony, the trial court could reasonably conclude that termination of appellants' parental rights was in the best interest of S.J.B. and A.B. *See id.* §§ 161.001(b)(2), 263.307(a); *see also In the Interest of J.F.C.*, 96 S.W.3d at 266; *Holley*, 544 S.W.2d at 371-72.

We conclude that the Department established, by clear and convincing evidence, that appellants committed the predicate acts enumerated in sections 161.001(1)(D) and (E) and that termination of appellants' parental rights is in the best interest of S.J.B. and A.B. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (2); *In the Interest of C.A.C., Jr.*, 2011 WL 1744139, at *1. Having concluded that the evidence was legally and factually sufficient to support the trial court's findings as to subsections 161.001(D) and (E), we need not address issue three, in which appellants challenge the sufficiency of the evidence that they failed to comply with

16

the provisions of a court order that set forth the necessary actions to obtain the return of the children. *See In the Interest of N.G.*, 2019 WL 2147263, at *4, *6; *In the Interest of C.A.C., Jr.*, 2011 WL 1744139, at *1; *see also* Tex. R. App. P. 47.1. We affirm the trial court's order terminating appellants' parental rights.

AFFIRMED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on May 21, 2019
Opinion Delivered August 8, 2019

Before McKeithen, C.J., Horton and Johnson, JJ.

17